**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **TIMOTHY LORNE YOUNGBLOOD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:17-CV-807-MAB** |
| ) | |
| **DR. JOHN TROST,** ) | |
| **JOHN R. BALDWIN,** ) | |
| **WEXFORD HEALTH SOURCES, INC.,** ) | |
| **and ALEX JONES,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motions for summary judgment filed by

Defendants Dr. John Trost and Wexford Health Sources, Inc. (Doc. 89) and Defendants

John Baldwin and Alex Jones (Doc. 92). For the reasons outlined below, the motions are

granted.

## BACKGROUND

Plaintiff Timothy Youngblood is an inmate in the Illinois Department of

Corrections, currently incarcerated at Lawrence Correctional Center. He filed this *pro se*

lawsuit pursuant to 42 U.S.C. § 1983 on July 28, 2017, alleging his constitutional rights

were violated when he was denied adequate medical care for two inguinal hernias over

the course of four years at various correctional facilities. Following a threshold review of

his complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on an

Eighth Amendment deliberate indifference claim against Defendants Dr. John Trost, IDOC Director John Baldwin, and Wexford Health Sources, Inc. for denying or delaying treatment and surgery for his two hernias (Doc. 8). Additionally, Alex Jones, who was the warden at Menard Correctional Center where Plaintiff was incarcerated at the time he filed the complaint, was added as a Defendant in his official capacity only for the purpose of implementing any injunctive relief that may have been ordered (Doc. 8).

Defendants filed their motions for summary judgment on the merits of Plaintiff's claim in September 2019 (Docs. 89, 92). Plaintiff filed a consolidated response to both motions for summary judgment (Doc. 96). The Wexford Defendants filed a reply (Doc. 99), which the IDOC Defendants later joined (Docs. 100, 101).

<u>FACTS</u>

**A. The Parties**

Plaintiff Jarron Youngblood was housed at the Sangamon County Jail from sometime in 2013 to January 2014 (Doc. 90, p. 2; Doc. 96, p. 1; *see also* Doc. 93-1, pp. 19–20; Doc. 93-2, pp. 2–4). He then entered the Illinois Department of Corrections ("IDOC") system at Graham Correctional Center and was subsequently housed at Shawnee for approximately two years, at Pontiac for approximately five months, at Menard for approximately one year, and then at Lawrence, where he remains incarcerated (Doc. 93-1, pp. 10–11; Doc. 93-2, pp. 2–4, 11–12, 35, 40–42, 65–67).

Defendant John Baldwin was the Director of the IDOC at all relevant times. Defendant Wexford Health Sources, Inc. ("Wexford") is a private corporation that contracts with the IDOC to provide medical services to inmates in IDOC facilities (Doc.

90-3, pp. 12–13). All of the physicians and nurse practitioners that Plaintiff saw regarding his hernias at Graham, Shawnee, Pontiac, Menard, and Lawrence were employees of Wexford (Doc. 90-3). Dr. John Trost was the Medical Director at Menard Correctional Center from November 2013 until March 2017 (Doc. 93-3, p. 5). Prior to that, he was a board-certified general surgeon, and he indicated that he has repaired "probably a thousand" hernias over the course of his career as a surgeon (*Id.* at pp. 7, 37).

### B. Hernias and Hernia Repair Surgery

An inguinal hernia happens when part of an internal organ or tissue bulges through a weak area of muscle in the groin.[1] Hernias can be classified as reducible, incarcerated, and strangulated. A reducible hernia can be returned back into the abdominal cavity either spontaneously or by manually pushing it back in. An incarcerated hernia means that the hernia is stuck and cannot be reduced back into the abdominal wall. A strangulated hernia is one that is stuck outside the abdominal wall and blood flow to the hernia is cut off. Once a hernia occurs, it does not resolve on its own; it remains until surgically repaired.

Wexford provided guidelines to its practitioners regarding the treatment of hernias (Doc. 97-1; Doc. 93-3, p. 12; Doc. 90-3, pp. 24–25). The guidelines provide that incarcerated hernias are "at risk for strangulation and require urgent surgical

---

[1] The information in this paragraph was found on the website of the National Institute of Diabetes and Digestive and Kidney Diseases. NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES, *What is an Inguinal Hernia?*, https://www.niddk.nih.gov/health-information/digestive-diseases/inguinal-hernia (last visited September 25, 2020). Information was also found in the deposition of Defendant Trost (Doc. 93-3, pp. 7–9, 17), and in Wexford's own internal guidelines for practitioners (Doc. 97-1).

surveillance," while strangulated hernias "represent a surgical emergency." (Doc. 97-1). Inmates with incarcerated or strangulated hernias are candidates for hernia repair surgery and "will be referred urgently for surgical evaluation" (*Id*.). On the other hand, inmates with "stable" hernias or hernias that do not impact their activities of daily living are not, in general, candidates for hernia repair surgery (*Id*.). The guidelines explicitly state, however, that the recommendations "are intended only as a guide for the site physicians and are not intended to replace hands-on clinical judgment" (*Id*.). "Decisions regarding patient suitability for consideration of [hernia repair surgery] must be made on a case-by-case basis" and (*Id*.). Wexford's corporate representative, Neil Fisher, reiterated that the decision whether to refer an inmate for hernia repair surgery was "an individual clinical decision based on the patient's history, their examination, and evaluation of the patient;" Wexford's guidelines do not dictate what care is going to be provided and are not intended to supplant clinical judgment (Doc. 90-3, pp. 24–25, 100).

For his part, Dr. Trost testified that he never used the guidelines provided by Wexford in determining whether to refer an inmate for hernia repair surgery and instead relied on his own training and experience as a general surgeon (Doc. 93-3, pp. 12, 37–38). His position on hernia repair surgery largely paralleled what the Wexford guidelines provided. Specifically, Dr. Trost indicated that acute incarcerations and strangulated hernias are both surgical emergencies (*Id*. at pp. 17, 28–30). Otherwise, surgical repair is an elective procedure (*Id*. at pp. 9–10). When determining whether to recommend an inmate for non-emergent surgical repair, he considered the size and location of the hernia, whether the hernia was stable or getting bigger, the patient's level of discomfort

associated with the hernia, and whether the hernia hindered the patient's activities of daily living (*Id.* at pp. 10, 19). He further testified that surgical repair is appropriate for reducible hernias if they are symptomatic, meaning they are causing pain or hindering the patient from "liv[ing their] life without problems" (*Id.* at pp. 10–11, 22). Dr. Trost testified that he never had any conversations with physicians at Wexford's headquarters regarding the costs of particular treatments (*Id.* at pp. 13–14).

### C.  Plaintiff's Hernias

Plaintiff was first diagnosed with a *right* inguinal hernia in 2013 while he was incarcerated at the Sangamon County Jail in Springfield, Illinois (Doc. 93-1, pp. 19–20). Plaintiff was transferred out of the Jail to Graham Correctional Center, where he arrived on January 3, 2014 (Doc. 93-2, p. 2). During his intake at Graham, Plaintiff self-reported a hernia (*Id.* at pp. 2, 4). He claims he also "complained about the pain" (Doc. 93-1, pp. 22, 23), but the medical record does not reflect such a complaint (*see* Doc. 93-2, pp. 2, 4). Plaintiff underwent a comprehensive physical exam on January 17, and a bulging right inguinal hernia was noted (*Id.* at pp. 3–4). Plaintiff was then scheduled to see the doctor regarding the hernia on January 28th (*Id.*). At his appointment he told the physician that his hernia was "long standing" and he "want[ed] something done" (*Id.* at p. 9). The physician noted that Plaintiff had "no pain," and the hernia was reducible (*Id.*) He prescribed Plaintiff a hernia belt but did not submit a referral request for surgery (*see id.*).

Following his intake at Graham, Plaintiff was transferred to Shawnee Correctional Center in February 2014 (Doc. 93-1, p. 22; *see also* Doc. 93-2, pp. 11, 12). According to Plaintiff, while he was at Shawnee, his right hernia was "constantly protruding and I was

constantly reducing it, pushing it back into my body and it was very painful" (Doc. 93-1, p. 29). He claimed that he "complained about pain numerous times and asked for surgery numerous times" while he was at Shawnee, but he was told that he would have to wait until he was released from prison to receive healthcare (*Id.* at pp. 24–25).

The medical records show that Plaintiff sought medical care for his hernia on only two occasions over the course of two years at Shawnee (Doc. 93-2, pp. 12–32) First, Plaintiff complained in March 2014 at a nurse sick call about ongoing pain in his testicles related to his hernia, which he rated as an eight out of ten (*Id.* at p. 16). She referred Plaintiff for a medical appointment (*Id.*), and he was seen three days later by a nurse practitioner (*Id.* at p. 17). The nurse practitioner wrote: "[Plaintiff] states feeling fine so far. States has hernia and is concerned it is strangulated. States has had blood in stool and dizziness and states these are symptoms of strangulated hernia. States last bloody stool [illegible] ago [and] last dizziness 4-5 days ago" (*Id.*). The nurse practitioner went on to note that Plaintiff was in "no acute distress" and had a "large" hernia in his right groin that was "able to reduce currently" (*Id.*). She provided ibuprofen to Plaintiff, advised him to avoid lifting over five pounds and to reduce the hernia when able (*Id.*). She also referred him to the medical doctor for an opinion on treatment (*Id.*).

Plaintiff saw the doctor on March 18th (Doc. 93-2, p. 18). The doctor wrote that Plaintiff "denies any problem with [activities of daily living]" and "denies any pain to right groin" (*Id.*). The doctor further noted that in Plaintiff's right groin there was an "8x5x4 cm soft mass gargling that disappears when laying down [and with] slight manipulation" (*Id.*). His assessment was "an easily reducible uncomplicated right

inguinal hernia" (*Id.*). He advised Plaintiff about the signs and symptoms of an incarcerated or strangulated hernia and told him to come to the health care unit if he noticed any of those signs and symptoms (*Id.*).

The only other visit at Shawnee related to Plaintiff's hernia occurred in August 2014, when Plaintiff requested a case because of low back pain and his hernia (Doc. 93-2, pp. 23–24). The doctor noted, in pertinent part, that Plaintiff had an "uncomplicated [right] inguinal hernia" and a cane was not medically necessary (*Id.*). The doctor offered Plaintiff NSAID pain reliever, but Plaintiff "refused to take this" (*Id.*). No medical providers at Shawnee ever indicated the hernia was not reducible or submitted a referral request for hernia repair surgery (*Id.* at p. 27; *see* Doc. 90-4, Doc. 93-2, Doc. 96-3).

In February 2016, Plaintiff was transferred to Pontiac Correctional Center (Doc. 93-2, pp. 33–35). According to Plaintiff, while he was at Pontiac, he was seen by a doctor for his *right* hernia and during that visit he reported to the doctor that he "had another hernia protruding on my left side and it was very painful" (Doc. 93-1, pp. 29–30). He claimed his requests for surgery at Pontiac were denied and he was only given laxatives and pain medication, neither of which helped (*Id.* at pp. 29–31).

The medical records show that in April 2016, Plaintiff sought medical care for fever, chills, and a cough (Doc. 93-2, p. 37). He also complained of pain in his right thigh; the doctor noted a reducible *right* inguinal hernia and he prescribed, amongst other things, Fiber-Lax and Motrin (*Id.*). There is no mention of a *left* hernia (*see id.*).

Plaintiff was seen for his annual physical exam on June 20, 2016 (Doc. 96-3, p. 14; *see also* Doc. 47-3, p. 49). The medical provider noted, in pertinent part, that Plaintiff had

a history of a *right* inguinal hernia that was "non-reducible," and referred Plaintiff to the medical director for further evaluation (Doc. 96-3, p. 14). Plaintiff then saw the medical director at Pontiac on June 23rd (*Id.* at p. 15). The medical director wrote that Plaintiff "feels well[,] asking for hernia surgery" (*Id.*). He examined Plaintiff and noted the hernia was "small, easily reducible" and "asymptomatic" (*Id.*). He instructed Plaintiff to continue taking Fiber-Lax and to return to the clinic as needed (*Id.*). Again, there is no mention of a second hernia on the *left* side in either the note from the annual exam or the visit with the medical director (*see id.*). No medical providers at Pontiac ever submitted a referral request for hernia repair surgery (*see* Doc. 90-4, Doc. 93-2, Doc. 96-3).

Plaintiff was transferred to Menard Correctional Center on July 20, 2016 (Doc. 93-1, p. 31; Doc. 93-2, pp. 40–42). According to Plaintiff, he complained about the hernias during the intake process (Doc. 93-1, p. 31), however, the intake records do not contain any mention of the hernias (Doc. 93-2, pp. 40–42). Rather, the medical records indicate that Plaintiff's first complaints at Menard came during a nurse sick call visit on October 21, 2016 (Doc. 92-3, p. 43; *see also* Doc. 90-4, Doc. 96-3). Plaintiff reported "hernia-groin" pain that he described as intermittent and varying between stabbing and constant; he reported the intensity as a seven out of ten (Doc. 92-3, p. 43). The nurse, however, noted there were no signs of obvious discomfort (*Id.*) The nurse referred Plaintiff to see the medical doctor (*Id.*). She also offered Plaintiff over-the-counter pain medication, which he refused (*Id.*).

Plaintiff was seen by a nurse practitioner four days later (Doc. 92-3, p. 44). The nurse practitioner noted the *right* inguinal hernia was large ("double-fist size"), firm, and

non-reducible (Doc. 93-2, p. 44). He submitted a request to collegial review for an evaluation by an outside surgeon and possible surgical repair of the *right* inguinal hernia (*Id.* at pp. 72, 73). Neither the notes from the visit nor the referral request mention a left inguinal hernia (*see id.* at pp. 44, 72).

The Wexford corporate representative described collegial review as physicians getting together and discussing a case on a scheduled conference call (Doc. 90-3, pp. 16–17). He explained that it's, typically, the facility medical director and a Wexford utilization management physician at Wexford's headquarters (*Id.*). The physicians make clinical judgments based on the case presented to them and come up with a plan of care that may include the requested surgery/outside treatment or may include an alternative treatment plan (*Id.*). Plaintiff, however, denied that collegial review is a collective decision-making process (Doc. 96, p. 2).[2] And Dr. Trost testified that "ultimately" the Wexford utilization management physician "had the nod of approval or to deny whatever the request it was" (Doc. 93-3, pp. 12–13).

On November 2, 2016, Dr. Trost presented the nurse practitioner's referral request at collegial review, and it was approved (Doc. 93-2, pp. 44, 73). The notes from collegial review state that Plaintiff had a "very large right inguinal hernia (double fist size)[.] No

---

[2] Plaintiff cites to Chief Judge Diane Wood's dissenting opinion in *Whiting v. Wexford Health Sources, Inc.*, wherein Judge Wood described collegial review as "a simple process through which one doctor consults with a second and allows the second to override his recommendation." 839 F.3d 658, 665 (7th Cir. 2016). Judge Wood explained that "[i]t is, in effect, a device to obtain a second opinion[,]" but noted that it was unclear from the record "whether the second doctor's 'no' automatically trumps the treating physician's judgment that a procedure is necessary . . . or if the second doctor just has an opportunity to persuade the first doctor to reconsider his opinion." *Id.* at 667.

bowel or urine difficulties. No mention of sliding or incarceration. Not reducible. Dr. Ritz approved. Meets [W]exfords guidelines" (*Id.*). On November 23rd, a medical furlough clerk scheduled Plaintiff for a surgical consultation on January 3, 2017 (Doc. 93-2, p. 46; Doc. 90-5, p. 5). Dr. Trost explained that once a referral is approved, Wexford and its employees have no involvement with scheduling the patient for the appointment (Doc. 93-3, pp. 30–31). It is handled by the medical furlough clerk, who is an IDOC employee (*Id.*) Dr. Trost further testified that the time between the approval by collegial review on November 2nd and the time of the consultation on January 3rd—approximately two months—was a reasonable and normal amount of time (*Id.* at pp. 23, 31–32).

Plaintiff was seen by surgeon Dr. Douglas Aach as scheduled on January 3, 2017 (Doc. 93-2, pp. 74–81). Dr. Aach noted that Plaintiff's chief complaint was "[right] groin hernia – painful" (*Id.* at p. 75). He examined Plaintiff and noted a "large" *right* inguinal hernia that descended into the scrotum (*Id.* at pp. 76, 80). Dr. Aach wrote that it was "partially reducible" and enlarging over time but not incarcerated or strangulated (*Id.*). Dr. Aach also noted that there was "a little bulge" in Plaintiff's *left* groin "with no [symptoms]³" (*Id.*). There was no "obvious" or "definite" *left* inguinal hernia on exam but there was a wide left inguinal ring (*Id.* at pp. 76, 80). Dr. Aach advised surgical repair for the *right* inguinal hernia (*Id.*). He indicated that Plaintiff declined exploratory surgery of

---

³ This word is difficult to read, but it appears that Dr. Aach wrote "Sxs" here, as well as other places in his notes. "Sxs" is medical shorthand for "symptoms," and makes sense in the context in which it appears in Dr. Aach's notes.

the left groin and wrote "Leave alone. May develop left inguinal hernia with time and need OR," which stands for operating room (*Id.*; *see also* Doc. 90-3, pp. 97–98).

After receiving Dr. Aach's recommendation, Dr. Trost submitted a referral request on January 23, 2017 for surgical repair of the *right* hernia (Doc. 93-2, p. 82). It was presented in collegial review on January 25th and approved (*Id.* at pp. 48, 83). It is undisputed that Dr. Trost had no other involvement in Plaintiff's medical care other than the two occasions he presented Plaintiff's case at collegial review (Doc. 90, p. 7; Doc. 96, p. 4; *see* Doc. 93-3, p. 25). Both times, the referrals for outside care were approved (Doc. 93-2, pp. 73, 83).

The medical furlough clerk noted the surgery had been approved and would "be scheduled soon. No auth issued yet." (Doc. 93-2, p. 48). In late February, Plaintiff was seen at nurse sick call for hernia pain and questioned when his surgery was going to happen (*Id.* at p. 49). It appears the surgery still had not been scheduled at that point (*see id.* at pp. 49, 50, 101; Doc. 90-5, p. 3; Doc. 96-3, p. 38). On March 6th, the surgery was scheduled for April 5th (Doc. 96-3, p. 38; Doc. 90-5, p. 3). Plaintiff's right inguinal hernia was surgically repaired as scheduled (Doc. 93-1, p. 36; Doc. 93-2, pp. 52, 84–85).

Dr. Trost testified that the time period between approval of the surgery by collegial review on January 25th and the time of the actual surgery on April 5th—approximately two and a half months—was a reasonable amount of time (Doc. 93-3, pp. 34, 45). He further testified that it is generally two to four months, sometimes longer, between the consultation with the surgeon and the actual time of the surgery (*Id.* at pp. 23, 32).

It is undisputed that Plaintiff received "continual" medical care at Menard following his surgery on April 5th until his transfer to Lawrence Correctional Center (Doc. 93, p. 4; Doc. 96, p. 5; *see also* Doc. 93-2, pp. 53–64). Plaintiff arrived at Lawrence on August 2, 2017, where he self-reported a hernia (Doc. 93-2, p. 66, 69). He was seen nine days later on August 11th by a doctor and stated that he needed surgery for his *left* inguinal hernia (*Id.* at pp. 68–69). The doctor wrote twice more in the note from the visit that Plaintiff "want[ed] surgery" (*Id.*). The doctor ordered Plaintiff a hernia belt and submitted a non-urgent referral request to collegial review that stated only "want [left] inguinal hernia surgery" (*Id.* at pp. 69, 70, 112). It was denied with a note that "hernia is reducible and patient does not meet criteria for surgical evaluation" (*Id.* at pp. 113, 114).

Plaintiff returned to the doctor the next month on September 27th, stating he had a "fist size" *left* inguinal hernia, he was in pain, and he "want[ed] surgery" (Doc. 93-2, p. 71). The doctor noted that the hernia was reducible and encouraged Plaintiff to use the hernia belt (*Id.*). The doctor told Plaintiff to return if the hernia was not reducible (*Id.*).

On July 6, 2018, Plaintiff saw a nurse practitioner and reported that his hernia was getting larger and more painful (Doc. 96-3, pp. 78, 79). He reported that his pain was an eight out of ten, he was constipated, and "the meds [were] no longer helping" (*Id.*). He said the hernia was "making him less active due to pain . . . it hurts to walk, especially up stairs" (*Id.*). He self-reported that the hernia was "reducible but painful" and stated that "he need[ed] a referral for hernia repair" (*Id.*). At that same appointment, Plaintiff reported a host of other problems and the nurse practitioner wrote "[h]e thinks he may need a brain biopsy" because "he thinks he may have anti MDA receptor encephalitis"

(*Id.*). The nurse practitioner submitted a referral request for a surgical evaluation of the hernia (*Id.* at p. 80). The nurse practitioner also referred Plaintiff to the medical doctor for an evaluation of his other symptoms (*Id.*).

The doctor saw Plaintiff four days later on July 10th (Doc. 96-3, pp. 82–83). Plaintiff reported, in pertinent part, a "fist size left reducible [inguinal] hernia" with "pain [for] two years" (*Id.*). He also claimed he had "a bowel blockage since two years" and stated he wanted surgery for his hernia (*Id.*) The doctor examined Plaintiff and noted he was in no distress and had a golf ball-sized hernia that was reducible (*Id.*). The doctor also noted that Plaintiff was not using the hernia belt (*Id.*). He nevertheless submitted a referral request for a surgical evaluation (*Id.* at pp. 82, 84).

The referral requests were discussed in collegial review on July 12th and denied (Doc. 96-3, pp. 84, 85, 87, 88; Doc. 90-3, p. 84). An alternative treatment plan was implemented to "re-evaluate the patient for the reported vision loss, complete neuro exam onsite, and to re-present in three weeks" (Doc. 96-3, p. 85). The Wexford corporate representative, who was part of that particular collegial review, testified that the alternative treatment plan was developed because if Plaintiff was indeed correct that he had anti-MDA receptor encephalitis, "that's a very serious illness" and "[a]n elective hernia repair would not be the priority; rather the priority would be to deal with [the] encephalitis, which is inflammation around the brain." (Doc. 90-3, pp. 84–85).

The referral request for hernia surgery was re-presented as planned in collegial review on July 26th and approved (Doc. 96-3, pp. 36, 37, Doc. 90-3, p. 84). On August 23rd, a surgical consultation was scheduled for September 17 (Doc. 90-4, p. 39). Plaintiff

was evaluated by general surgery at Lawrence County Hospital on September 24th (not September 17th as originally scheduled) (*see* Doc. 96-3, pp. 91–92). Following that appointment, a new referral request was submitted, indicating that Plaintiff had a "large incarcerated [left inguinal hernia]" and needed surgical repair (*Id.* at pp. 90, 91). Collegial review discussed and approved the referral on September 27th (*see id.* at p. 92; Doc. 90-4, p. 41). The surgery was scheduled for and occurred on October 1st (Doc. 90-4, pp. 41, 42).

### D. Facts Related to Defendant John Baldwin

Plaintiff submitted a grievance at Pontiac dated May 15, 2016 regarding his hernia (Doc. 96-2; *see also* Doc. 47-3, pp. 46–51, Doc. 64).[4] He claimed that it was a "strangulated hernia" that was "protruding" and "very painful" (Doc. 47-3, pp. 46–51). He stated that he saw a doctor in early April and told the doctor that his hernia was at least two years old and had gotten worse; he was having difficulty pooping; he was experiencing dizziness and sharp pain in his right inner thigh, which he rated as an eight out of ten; and he now had a second hernia on the left side (*Id.*). He complained that his request for surgery was denied and he asked for both hernias to be surgically repaired (*Id.*). This grievance was denied by the warden on July 27th and Plaintiff appealed to the ARB (*Id.*). The ARB received the appeal on August 23rd but did not issue a decision until January 26, 2017 (*Id.*). The ARB denied the appeal as moot because, by that point, Plaintiff had

---

[4] Plaintiff also mentions that he filed a grievance on March 3, 2016 (Doc. 96, p. 10). This grievance was submitted at Pontiac about the purported lack of medical care at Shawnee (Doc. 1-1, pp. 1–2; Doc. 96-1). Because it involved issues at a facility other than the one Plaintiff was currently housed at, it was submitted directly to the ARB (Doc. 47-3, pp. 1, 18). The ARB returned the grievance to Plaintiff without addressing it because it did not comply with procedural requirements (*Id.*). There is no indication that John Baldwin ever saw this grievance, and Plaintiff did not argue otherwise (*see id.*; *see* Doc. 96). Consequently, this grievance has no bearing on the summary judgment analysis and the Court will not address it any further.

been approved for hernia surgery (*Id.*). The decision was signed by Sherry Benton on behalf of the ARB (*Id.*). John Baldwin, through a designee, concurred (*Id.*).

It is undisputed that Dr. Trost had no communication with John Baldwin regarding Plaintiff's hernia condition (Doc. 93, p. 4; Doc. 93-3, p. 35; Doc. 96, p. 5).

## DISCUSSION

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a plaintiff must demonstrate that they suffered from an "objectively serious medical condition" and that the defendant acted with a "sufficiently culpable state of mind," namely deliberate indifference. *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)).

For purposes of summary judgment, none of the Defendants dispute that Plaintiff suffered from an objectively serious medical condition (*see* Docs. 90, 93). Their only arguments relate to the second prong of a deliberate indifference claim (*see* Docs. 90, 93). "A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662 (quoting *Farmer*, 511 U.S. at 837). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073 (citation omitted). It is "something akin to recklessness." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019) (citation omitted).

## A.  John Baldwin

Plaintiff claims that Defendant John Baldwin was deliberately indifferent to his serious medical needs because Baldwin knew about Plaintiff's *left* inguinal hernia, which

was the second hernia that developed, but ignored Plaintiff's request to have it surgically repaired (Doc. 96, p. 21). Specifically, Plaintiff contends that Director Baldwin knew about the *left* hernia by virtue of the May 2016 grievance (*Id.*). Director Baldwin determined that grievance was moot because Plaintiff had been approved for hernia surgery (*Id.*). However, Plaintiff points out that the surgery was only for the *right* hernia and contends that Director Baldwin was deliberately indifferent when he mooted the grievance without addressing the lack of medical care for the *left* hernia (*see id.*).

When it comes to non-medical officials like Director Baldwin, it is well-established that these officials are entitled to defer to the judgment of the medical professionals. *E.g.*, *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005).

> If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.

*Arnett*, 658 F.3d at 755 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). However, non-medical officials can be held liable for deliberate indifference if they ignore the prisoner's complaints or "have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (quoting *Spruill*, 372 F.3d at 236); *see also Johnson v. Doughty,* 433 F.3d 1001, 1012 (7th Cir. 2006) (citing *Bond v. Aguinaldo,* 228 F.Supp.2d 918, 920 (N.D. Ill. 2002) ("Except in the unusual case where it would be evident to a layperson

that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

Here, there is no evidence from which a reasonable jury could conclude that Director Baldwin was deliberately indifferent to Plaintiff's *left* hernia. The ARB received Plaintiff's appeal of his grievance on August 23, 2016 but did not address it until late January 2017 (*see* Doc. 47-3, pp. 46–48). The ARB representative looked into Plaintiff's complaints and asked the facility health care unit administrator about the current status of his hernia issues (*Id.*). She was informed that Plaintiff had "a hernia surgery consult" and collegial review had approved Plaintiff "for the hernia surgery" (*Id.*). She therefore recommended denying the grievance as moot and Baldwin concurred (*Id.*). Baldwin did not disregard Plaintiff's complaints about his *left* hernia. Rather, Baldwin knew that Plaintiff had been evaluated by a surgeon and approved for surgery. Thus it appeared that Plaintiff was receiving the medical care he wanted for the grieved condition. There is nothing that shows Director Baldwin was aware the surgery was only for Plaintiff's *right* hernia. The notes from the facility health care unit administrator did not differentiate between the left and right hernias. And there is no indication that Baldwin had Plaintiff's medical records or any other sort of information that could have alerted him to the fact that the surgery was only for Plaintiff's *right* hernia (*see* Doc. 96). To the extent Director Baldwin failed to appreciate that Plaintiff's *left* hernia was not being surgically repaired, this evinces, at most, a negligent handling of the complaint and not deliberate indifference.

On the other hand, even if the Court assumes Director Baldwin knew the details

of Plaintiff's surgical consult and the forthcoming surgery, there is nothing that suggests Baldwin had any reason to believe he was exposing Plaintiff to a substantial risk of serious harm by not intervening and insisting that the *left* hernia also be surgically repaired. The surgeon who saw Plaintiff noted there was no definite or obvious *left* inguinal hernia and was content to "leave [it] alone." Plaintiff did not put forth evidence from any medical professional that surgery on the *left* hernia was medically necessary in January 2017 and should have been performed. To the extent Plaintiff wanted some type of surgery, inmates are not entitled to demand specific care. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Under the circumstances, Baldwin had no "reason to doubt" that the surgeon based his recommendation on medical judgment and was adequately addressing Plaintiff's concerns. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017); *Arnett*, 658 F.3d at 756 ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service.") (quoting *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009)). Accordingly, John Baldwin is entitled to summary judgment.

**B.  Dr. John Trost**

Dr. Trost was the Medical Director at Menard Correctional Center. He never met with Plaintiff or personally provided treatment to him for his hernias. His only involvement in Plaintiff's medical care was presenting the referral requests from other medical providers in collegial review on two occasions—the first for surgical consultation and the second for hernia repair surgery. There is no indication that Dr. Trost was aware of Plaintiff's hernia issues prior to receiving the first referral request. Both of the referral

requests that Dr. Trost presented were approved. To the extent there were delays in scheduling Plaintiff's consultation with the outside surgeon or his surgery, it is undisputed that Dr. Trost was not responsible for scheduling appointments. There is also no evidence that Dr. Trost was ever made aware of any scheduling delays with respect to Plaintiff's outside care. Plaintiff concedes that Dr. Trost cannot be held liable for deliberate indifference based on these facts (Doc. 96, p. 20). Consequently, Dr. Trost is entitled to summary judgment.

### C.  Wexford Health Sources, Inc.

A private corporation acting under the color of state law, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). Under *Monell*, a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir.2010)). A corporate action can take the form of an express policy adopted and promulgated by the corporation, an informal but widespread and well-settled practice or custom, or a decision by an official of the corporation with final policymaking authority. *Glisson*, 849 F.3d at 379.

Here, Plaintiff invokes the second theory and argues that his injuries were the byproduct of an unlawful widespread practice (Doc. 96, p. 11). In particular, Plaintiff contends Wexford has a widespread practice of not authorizing surgery for reducible hernias, no matter how painful, in order to cut costs (*Id.*) He claims that his medical records "clearly show that [he] was denied surgical treatment for many months, even

years, for both hernias, because [they were] classified as "reducible" (*Id.*).

In order to prevail on his claim, Plaintiff must show a constitutional violation, meaning surgery was medically necessary to treat his hernias and the pain they caused but was not provided. Seventh Circuit Pattern Jury Instruction, Civil No. 7.24, *see also id.* at No. 7.17. He must also show that Wexford had a widespread practice of not authorizing surgeries for hernias that were reducible even if they were symptomatic; that the practice caused the constitutional injury, meaning the practice was the "moving force" behind the injury; and that Wexford policymakers were deliberately indifferent to the known or obvious risk that the policy would lead to constitutional violations. Seventh Circuit Pattern Jury Instruction, Civil No. 7.24; *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020); *Hall v. City of Chicago*, 953 F.3d 945, 950–51 (7th Cir. 2020); *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008).

To support his claim, Plaintiff points to the fact that multiple clinicians across multiple facilities declined to refer him for hernia repair surgery while referencing that the hernia was reducible (Doc. 96, pp. 17–18). He also points out that the collegial review decisions referenced whether a hernia was reducible or incarcerated and whether the "policy," "criteria" or "guidelines" were satisfied (*Id.*; *see also* Doc. 93-2, pp. 73, 83, 113). According to Plaintiff, it is therefore clear from the medical records that clinicians were "acting in accordance with Wexford's 'guidelines'"—the ones they provide to clinicians[5]—by not referring him for surgery, and it can be reasonably inferred that the

---

[5] *See supra* pp. 3–4.

guidelines "are really their widespread custom and practice" (Doc. 96, p. 18).

Plaintiff is arguing, in essence, that the decisions of various practitioners not to refer him for hernia surgery were not the product of professional judgment. Rather, the practitioners eschewed their professional judgment and made their decision based on Wexford's practice of not providing surgery for reducible hernias. That means Plaintiff's theory of *Monell* liability against Wexford depends on the individual liability of the practitioners. *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013) (in case where prisoner claimed doctor failed to order medical care based on Wexford's purported policy of limiting medical care in order to cut costs, Wexford could not be held liable because prisoner failed to show the doctor was individually liable for deliberate indifference); *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (same). And "negating individual liability will automatically preclude a finding of *Monell* liability." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016).

Here, Plaintiff has failed to demonstrate a question of fact as to whether any of the clinicians at Graham, Shawnee, Pontiac, Menard, and Lawrence, or the physicians at Wexford's headquarters who participated in collegial review, were individually liable for deliberate indifference (*see* Doc. 96). He conceded that Dr. Trost was not deliberately indifferent (*see id.* at p. 20) And he made no specific argument as to any of the other clinicians (*see id.*). The undisputed evidence is that the decision whether to request surgery for a reducible hernia is not a black and white decision; it is discretionary and takes into account various factors (Doc. 90-3, pp. 24–25, 100; Doc. 93-3, pp. 10, 19). It is not as though Plaintiff's particular circumstances so plainly called for surgery such that

that the decision not to recommend it was obviously wrong and "blatantly inappropriate." *Pyles*, 771 F.3d at 409.[6] Nor did Plaintiff submit any medical evidence that the decision was a "substantial departure from accepted professional judgment." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). Since Plaintiff has not established that any clinician was individually liable for deliberate indifference,[7] he did not suffer an actionable injury from the widespread practice he attributes to Wexford. Wexford is therefore entitled to summary judgment.

But even if there was an underlying constitutional violation by one of the individual clinicians, Plaintiff has not put forth evidence sufficient for a reasonable jury to conclude that the clinicians' treatment decisions were made pursuant to the alleged widespread practice or that the widespread practice even existed. He contends that because each clinician noted whether or not his hernia was reducible demonstrates their

---

[6] *See Johnson v. Doughty*, 433 F.3d 1001, 1008 (7th Cir. 2006) (affirming judgment for doctor who concluded surgery was not medically necessary for reducible hernia and prescribed non-surgical remedies to alleviate inmate's pain). *But see Broaddus v. Wexford Health Sources*, Case No. 15-cv-1339-SCW, 2018 WL 1565603 (SD Ill. March 30, 2018) (denying summary judgment for Wexford where it could be inferred there was a practice of delaying surgery as long as possible for reducible hernias where inmate's hernia was "the size of a tennis ball to a softball," he complained of pain and nausea, it began to pop out more frequently, it became harder and took longer to reduce, he sought treatment some 30 times over the course of two and a half years, multiple clinicians, including an outside surgeon, recommended surgery, he had to be given Vicodin on one occasion to manage his pain, and the hernia became strangulated before surgery was finally approved).

[7] It is readily apparent that many of the clinicians were *not* deliberately indifferent. For example, Plaintiff's first documented complaint about his *right* hernia at Menard led to a referral for a surgical consultation that was approved. Therefore, no reasonable jury could find any of the clinicians at Menard were deliberately indifferent with respect to his *right* hernia. As another example, Plaintiff claims he reported the *left* hernia at Pontiac sometime in 2016 but, in January 2017, an outside surgeon evaluated Plaintiff and was unable to detect an "obvious" or "definite" *left* hernia and did not recommend surgery on the *left* side. Therefore, no reasonable jury could find that any of the clinicians who treated Plaintiff at Pontiac and Menard prior to his visit with the surgeon were deliberately indifferent. In other words, if it did not necessitate surgery at the time the surgeon saw him, it obviously did not necessitate surgery at any time prior to that.

treatment decisions were "based on the single factor of whether the hernia was reducible or incarcerated" (Doc. 96, p. 18). But that conclusion does not necessarily follow from the facts. There are only three ways to classify a hernia: reducible, incarcerated, or strangulated. Two present an urgent, if not emergency, medical situation in which surgery is a necessity (*see supra* pp. 3–5). The third does not; a reducible hernia generally poses no medical risk and surgery is therefore elective (*id.*). Classifying the type of hernia at issue appears to be the first and most basic factor in determining how to treat it (*see, e.g.,* Doc. 93-3, pp. 7–10; Doc. 97-1). It should therefore come as no surprise—in fact, it should be expected—that clinicians evaluating a hernia would always include a classification in their notes. Simply put, Plaintiff's argument is based solely on his own speculative interpretation of the facts and is not supported by any actual evidence that the clinicians rotely decided, without any consideration for his personal circumstances, not to refer him for surgery because his hernia was reducible.

Plaintiff also argues that Wexford's guidelines—their mere existence, clinicians' references to the guidelines, their obvious reliance on the guidelines, etc.—demonstrate that the decision whether to authorize hernia surgery came down to whether the hernia was reducible (Doc. 96, pp. 17–19). This argument is problematic, however, because it suggests Wexford's guidelines provide, or at the very least suggest, that reducible hernias will never be approved for surgery (*see id.*). But that is simply not the case. Rather, the guidelines provide that reducible hernias that are "stable" are generally not candidates for surgery and hernias that "do not impact on an inmate's [activities of daily living]" will not be considered for surgery (Doc. 97-1). This necessarily implies that reducible

hernias that are unstable (meaning getting larger), are painful and debilitating, and/or hinder normal activities can be considered for surgery. Moreover, the guidelines explicitly say they are "intended only as a guide" and "are not intended to replace hands-on clinical judgment" (Doc. 97-1). Practitioners are explicitly instructed that decisions regarding suitability of surgery must be made on a case-by-case basis (*Id.*). Wexford's corporate representative also stressed that the guidelines did not dictate what care was going to be provided and the decision whether to recommend surgery for a reducible hernia was a matter of professional judgment based on various factors (Doc. 90-3, pp. 24–25, 100). Therefore, contrary to Plaintiff's assertions, clinicians following the guidelines would not be problematic because it means their decisions whether to recommend or approve hernia surgery would not be solely based on whether the hernia was reducible.

Additionally, at least one practitioner, Dr. Trost, testified that his decisions whether or not to recommend surgery for a reducible hernia were *always* based on his clinical judgment and he *never* relied on the guidelines (Doc. 93-3, pp. 12, 37–38). He further testified that his decisions were never based solely on whether the hernia was reducible; rather, he considered a number of factors, including size and location of the hernia, as well as, pain, discomfort, and limitations associated with the hernia (*Id.* at pp. 10, 19). He also testified that surgery was appropriate for symptomatic yet reducible hernias (*Id.* at pp. 10–11, 22), and "the vast majority" of his referral requests for hernia repair surgery in non-emergent, elective scenarios were approved (*Id.* at pp. 19–21). Plaintiff made no attempt to challenge Dr. Trost's testimony (*see* Doc. 96).

Finally, and perhaps most importantly, the medical records demonstrate that the

alleged widespread practice was not at play when Plaintiff got surgery on his *left* hernia. Specifically, the records show that Plaintiff was referred for a surgical consult he and the medical doctor both described it as "reducible" (Doc. 96-3, pp. 78, 79, 82–83).

Consequently, given the holes in Plaintiff's arguments and the unchallenged evidence in the record, no reasonable jury could conclude that Wexford had a blanket policy of not authorizing elective surgery for reducible hernias or that Plaintiff was denied surgery pursuant to that policy.[8] For all of these reasons, Wexford is entitled to summary judgment.

**D. Alex Jones**

Alex Jones is no longer the warden at Menard and Plaintiff is no longer incarcerated at Menard. However, a new prison official need not be substituted in his place, *see* FED. R. CIV. P. 25(d), because injunctive relief is off the table now that summary judgment has been granted to Defendants (not to mention Plaintiff's claim for injunctive relief became moot after he received surgery on both of his hernias). Consequently, Alex Jones is dismissed as a Defendant in this case.

<u>CONCLUSION</u>

The motion for summary judgment filed by Defendants Wexford Health Sources,

---

[8] The Court also questions whether Plaintiff has sufficiently shown the complained of practice was truly widespread given that his evidence is limited to his own personal experience and there is a relatively low number of instances where it is at least debatable whether the clinicians' decision not to refer Plaintiff for surgery was problematic. *See Hildreth v. Butler*, 960 F.3d 420, 426–27 (7th Cir. 2020) (affirming summary judgment on *Monell* claim because prisoner's allegations of delays were insufficiently widespread, as they involved only him, and the alleged delays were insufficiently numerous, as he has substantiated only three over the course of nineteen months). The Court need not address this, however, given that Plaintiff's claim fails for multiple other reasons.

Inc. and Dr. John Trost (Doc. 89) and the motion for summary judgment filed by John

Baldwin and Alex Jones (Doc. 92) are **GRANTED.** Judgment is granted in their favor and

this case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter

judgment and close this case on the Court's docket.


      **IT IS SO ORDERED.**

      **DATED: September 30, 2020**

                      **s/ Mark A. Beatty**
                      **MARK A. BEATTY**
                      **United States Magistrate Judge**